UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

===================================

HSBC BANK USA, NATIONAL ASSOCIATION,

                                        Appellant,

                v.                                      DECISION AND ORDER
                                                            07-CV-553A

ADELPHIA COMMUNICATIONS                    (Administratively Consolidated
CORPORATION, et al.,                              under 07-CV-553A)

                                        Appellees.

===================================

KEY BANK NATIONAL ASSOCIATION,

                                        Appellant,

                v.                                           07-CV-555A

ADELPHIA COMMUNICATIONS
CORPORATION, et al.,

                                        Appellees.

===================================

THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF ADELPHIA COMMUNICATIONS
CORPORATION,

                                        Appellant,

                v.                                           07-CV-554A

FLEET NATIONAL BANK et al.,

                                        Appellees.

===================================

## INTRODUCTION

This is a consolidated appeal from an order of the Bankruptcy Court. Fleet National Bank ("Fleet"), HSBC Bank USA , National Association ("HSBC") and Key Bank National Association ("Key Bank") (collectively, the "Banks"), were lenders to Niagara Frontier Hockey, LP ("NFHLP").  NFHLP owned the Buffalo Sabres, a National Hockey League ("NHL") team, and had interests in the HSBC Arena, the Sabres' home rink.  The Banks funded the construction of the Arena and the operations of NFHLP during the 1990s with three separate loans.

In 2000, Adelphia Communications Corporation ("Adelphia") purchased two of the three Bank loans for a total of $34.1 million.  Adelphia filed for bankruptcy protection in June 2002 in the Bankruptcy Court for the Southern District of New York.

In January 2003, NFHLP filed for bankruptcy protection in the Bankruptcy Court for the Western District of New York.  The sale of NFHLP's assets was authorized in April 2003, after a hearing in the Bankruptcy Court.  Adelphia, NFHLP's single largest secured and non secured creditor, released its liens on the NFHLP assets (which it acquired pursuant to the two purchased loans) "free and clear" in favor of the purchaser.  Adelphia also agreed that proceeds of the sale could be used to pay off the third loan.

In July 2003, Adelphia and the Official Committee of Unsecured Creditors of Adelphia Communications Corporation (now Adelphia Recovery Trust) ("the Committee") sued the Banks in the Southern District of New York as an adversary proceeding in the Adelphia bankruptcy.  Adelphia and the Committee alleged that the

2

Adelphia funds used to purchase the two loans and pay the principal and interest on the third loan were fraudulent conveyances.

The Banks filed proofs of claim in the NFHLP bankruptcy in the Western District, stating that, to the extent the Committee obtained a judgment on its fraudulent conveyance claims in the Southern District, the Banks had a claim against the NFHLP estates.  The NFHLP debtors brought a declaratory judgment action seeking to disallow the Banks' proofs of claim.  The Banks filed cross-claims against Adelphia and the Committee asserting various affirmative defenses barring Adelphia's and the Committee's continued prosecution of the fraudulent conveyance claims asserted against the Banks in the Southern District adversary proceeding.  All parties cross-moved for summary judgment.

The Bankruptcy Court granted Fleet's motion for summary judgment, but denied all the other motions for summary judgment, without prejudice to such motions being raised again in the Southern District adversary proceeding.  These appeals followed.

## STATEMENT OF THE FACTS[1]

### A.   The Parties and Other Significant Persons

#### 1.   John Rigas and Adelphia Communications Corporation

John Rigas was one of the founders of Adelphia, which at its peak was the fifth largest cable company in the United States. Rigas and his sons (through a corporation, Patmos, Inc.) became the owners of the Buffalo Sabres and the sole partners of NFHLP in July 2000.   In 2004, John Rigas was convicted of bank, wire and securities fraud based on allegations that he concealed $2.3 billion in liabilities from Adelphia investors and used Adelphia funds as his personal funds.  He was sentenced to 15 years in federal prison.

#### 2.   Adelphia Recovery Trust

The Adelphia Recovery Trust is the successor to the Official Committee of Unsecured Creditors of Adelphia (hereinafter the "Committee").  For the purposes of the issues presented here, the Committee stands in the shoes of Adelphia and has the same rights, claims and defenses as Adelphia.

#### 3.   Niagara Frontier Hockey, L.P.

NFHLP is a Delaware partnership which was formed on March 14, 1988. NFHLP's main assets were the Buffalo Sabres and its interests in the HSBC Arena.

---

[1]   The facts in this case are some of the most complex that this Court has encountered.  In an attempt to make the case more understandable, the Court has tried its best to simplify the facts, while at the same time accurately conveying all the relevant facts necessary for determining the issues presented here.

NFHLP ran the team and the HSBC Arena through its subsidiaries, including Crossroads Arena LLC ("CALLC") and Buffalo Sabres Concession LLC ("Sabres Concession").  In July 2000, John Rigas and his sons (using Adelphia money), bought out the limited partners of NFHLP.

NFHLP and its subsidiaries filed for bankruptcy protection in the Bankruptcy Court for the Western District of New York in January 2003 (the "NFHLP Bankruptcy"), and the case was assigned to Bankruptcy Judge Michael J. Kaplan.

### 4. Patmos, Inc.

Patmos, Inc. ("Patmos") is a Delaware corporation which was incorporated on March 4, 1998.  John Rigas was President of Patmos and his sons Michael, Timothy and James Rigas were Executive Vice-Presidents.  Patmos became the General Partner of NFHLP in July 2000.  The shareholders of Patmos consisted only of John Rigas and members of the Rigas family.

### 5. Sabres, Inc.

Sabres, Inc. (a wholly-owned subsidiary of Adelphia), is a Delaware corporation which was incorporated on May 26, 1995.  The sole members of the Board of Directors of Sabres, Inc., in 2000, were John, Michael, Timothy and James Rigas. Between the years 1995 and 2000, Sabres, Inc. was the holder of significant economic interests in NFHLP and was NFHLP's largest creditor.  Sabres, Inc. filed for bankruptcy protection in June 2002.

6.    **The Banks**

The Banks are national banking associations.  They were NFHLP's major lenders from approximately 1995 to 2000, particularly in connection with the construction of the HSBC Arena in downtown Buffalo.

7.    **The Buffalo Sabres Loans**

On May 10, 1995, the Banks entered into two loans with a combined face value of $67.5 million in connection with NFHLP's construction of the HSBC Arena:  a "Building Loan Contract" with CALLC (the "Construction Loan") and an "Interim and Term Concession Loan Agreement" with Sabres Concession (the "Concession Loan"). On February 28, 1997, NFHLP and Fleet entered into an "Amended and Restated Credit Agreement" which established a revolving line of credit in favor of NFHLP in the principal amount of $12 million for working capital and general partnership purposes (the "Revolver Loan").  The Construction, Concession and Revolver Loans are referred to herein collectively as the "Buffalo Sabres Loans."

Pursuant to the Buffalo Sabres Loans, the Banks had liens on substantially all of the assets of NFHLP.

8.    **Sale of the Construction and Revolver Loans to Sabres, Inc., and the Sale of NFHLP to the Rigas Family**

In 2000, the Banks decided to sell all their interests in all the Buffalo Sabres Loans to Sabres, Inc.  On March 17, 2000, the Banks sold their interests in the Construction and Revolver Loans to Sabres, Inc., pursuant to a "Junior Participation

Agreement," whereby the Banks sold to Sabres, Inc. "95% undivided junior participation interests" in the advances, loans and obligations owed by CALLC and NFHLP to the Banks, respectively.  The Junior Participation Agreement contained a transitional mechanism whereby the 95% interest converted into a 100% interest upon the NHL's consent to the transfer.  It is uncontested that the Junior Participation Agreement eventually ripened into 100% ownership by Sabres, Inc.

On March 22, 2000, pursuant to the terms of the Junior Participation Agreements, Sabres, Inc. transferred approximately $34.1 million to the Banks ($18,583,542 to Fleet; $11,595,398 to HSBC; and $3,902,444 to Key Bank) in exchange for the Construction and Revolver Loans.

The sale of the Concession loan to Sabres, Inc. never came to fruition because the consent from a necessary third party could not be obtained.

Simultaneous to the sale of the Construction and Revolver Loans to Sabres, Inc., John Rigas and Patmos acquired NFHLP.


9.     **Adelphia Bankruptcy**

On June 25, 2002, Adelphia filed for bankruptcy protection in the Bankruptcy Court for the Southern District of New York following disclosures of fraud and off-balance-sheet liabilities (the "Adelphia Bankruptcy").

10.    **NFHLP Bankruptcy and Sale of NFHLP Assets to Hockey Western**

_____On January 13, 2003, NFHLP filed for bankruptcy protection in the

Bankruptcy Court for the Western District of New York (the "NFHLP Bankruptcy").

Shortly after the filing, Hockey Western LLC ("Hockey Western") agreed to purchase

NFHLP's assets.  A hearing to approve the sale, wherein substantially all of the assets

of NFHLP were sold to Hockey Western "free and clear" of liens claims and

encumbrances, was held in the Bankruptcy Court on April 10, 2003.  At the sale

hearing, NFHLP made a presentation and proffered witnesses who were prepared to

testify that the offer from Hockey Western was the best (indeed, the only) offer for the

team and that if the sale did not happen quickly, the team would not be able to stay in

Buffalo.

On January 13, 2003, NFHLP filed for bankruptcy protection in the

Adelphia sought and was given permission in the Adelphia Bankruptcy to

appear as a creditor in the NFHLP Bankruptcy.  The February 5, 2003 Order (the

"Adelphia Approval Order") allowing Adelphia to appear provided that Adelphia was

"authorized in the exercise of [its] business judgment to consent to the sale of certain

assets of [NFHLP] in connection with any sale process [under the Bankruptcy Code]"

and that any "conveyance of [Adelphia's] interest in [NFHLP] in connection with any

sale process . . . shall be free and clear of any liens, interests or encumbrances of any

of [Adelphia's] creditors or lenders, with such Liens, if any, to attach to the net

proceeds, subject to the rights and defenses of [Adelphia] with respect thereto . . . ."

At the April 10, 2003 sale hearing, Adelphia entered into a Stipulation and

Order (the "Adelphia Stipulation and Order"), agreeing to release the liens, security

interests and guarantees that it held as collateral for the Construction and Revolver

Loans.  Adelphia also agreed that proceeds of the sale could be used to pay off the Concession Loan.  In calculating the amount due on the Concession Loan, full credit was given to the $11.3 million in principal and interest payments Adelphia had already paid on the Loan.  Adelphia consented to the "cash out" amount of $21.4 million for the Concession Loan.

Counsel for Adelphia appeared at the sale hearing by telephone.  He told the Bankruptcy Court that Adelphia had agreed to release its rights to the collateral supporting the Construction and Revolver Loans so that, among other things, the sale could go through, the team could stay in Buffalo, and the claims of unsecured creditors would not be swamped by Adelphia's $200 million proof of claim.  He also stated that as consideration for releasing its rights, Adelphia would receive (1) the release of two letters of credit totaling $27.6 million, and (2) assumption of a broadcast agreement for broadcast rights to the Buffalo Sabres for five years beginning September 2002.  In addition, Adelphia would receive the benefit of being relieved of its obligation to continue making cash advances–which between March 2000 and January 2003 amounted to between $26-35 million–to the struggling Buffalo Sabres franchise to protect the Construction Loan and Adelphia's collateral.

At one point during the sale hearing, the Bankruptcy Judge stated:

> [W]hen I was reading the draft order and saw that all the parties who had liens and so forth would have consented and so forth, and I was wondering how we were going to get those and who they needed to be from, I was wondering how that was going to be handled and I guess what we have, having read the stipulations, is that everybody who anybody thinks actually has legal or equitable or beneficial interest in some kind of ownership or lien on the assets of these debtors have all signed the same stipulation; essentially identical stipulations, so that we needn't worry about that unless there's some entity that slipped through the cracks, but I

doubt that would have happened with the quality of representation that we
have here.  So those who haven't seen them should rest assured that in
fact the pertinent public officials and officers have, in fact, executed what
is necessary to permit this sale.

Committee's Record on Appeal at 10094-96.

Adelphia's counsel did not respond to the Judge's statement and never

mentioned at the sale hearing any possible fraudulent conveyance claims against the

Banks.

At the time of the sale, the Banks were all creditors of NFHLP: Fleet as

primary lender on the Concession Loan, Key as co-lender on the Concession Loan, and

HSBC by virtue of a naming rights agreement to the HSBC Arena.  While Fleet

appeared at the sale hearing, HSBC and Key did not.

At the conclusion of the sale hearing, the Bankruptcy Court issued an

Order approving the sale (the "Sale Approval Order").

### 11.   Southern District Adversary Proceeding

On July 6, 2003, less than three months after entry of the Sale Approval

Order in the NFHLP Bankruptcy, Adelphia and the Committee filed a multi-count, multi-

party adversary complaint against the Banks and several other lending and investment

banking institutions in the Adelphia Bankruptcy (the "Southern District AP").  The

Southern District AP alleges, among other things, that the bank defendants aided and

abetted John Rigas's breach of his fiduciary duties to Adelphia.

Counts 17-24 of the Southern District AP complaint assert intentional and

constructive fraudulent conveyance claims against the Banks in connection with the

March 2000 transfer of $34.1 million by Sabres, Inc. to the Banks in exchange for the

Banks' interests in the Construction and Revolver Loans.  Counts 17-24 also allege, as

an intentional or constructive fraudulent conveyance, the transfer of $14 million made

by Adelphia to the Banks to pay principal and interest payments on all three of the

Buffalo Sabres Loans.


### 12.    The Banks' Proofs of Claim in the NFHLP Bankruptcy

After receiving the Southern District AP complaint, the Banks filed proofs

of claim in the NFHLP Bankruptcy.  Those claims stated in essence that, to the extent

the Committee and Adelphia are successful in their fraudulent conveyance claims and

are awarded judgment in their favor, the Banks will have a claim against the NFHLP

debtors in the same amount.


### 13.    Banks' Cross-Claims Against Adelphia and the Committee

On November 5, 2003, the NFHLP debtors brought a declaratory

judgment action against, among others, the Banks.  NFHLP sought a declaration that

the Banks' proofs of claim should be either reclassified or subordinated to other claims.

The Banks asserted amended cross-claims against Adelphia and the Committee,

alleging that Adelphia and the Committee should be estopped from prosecuting their

fraudulent conveyance claims in the Southern District AP.  The Banks argued that

estoppel is appropriate because in the NFHLP Bankruptcy, Adelphia represented that it

was the sole owner of the Construction and Revolver Loans and consented to the

payoff of the Concession Loan, and never put either the Bankruptcy Court or the Banks on notice of any possible fraudulent conveyance claims.

Prior to the beginning of discovery and following an unsuccessful motion to dismiss by the Committee, the Southern District Bankruptcy Court (after consultation with the Western District Bankruptcy Court), issued a "Jurisdictional Order" relinquishing jurisdiction so that Western District Bankruptcy Court could determine "whether [Adelphia's] participation in the process of the sale of the [NFHLP] Debtors' assets . . . estopped or released [Adelphia's and the Committee's] claims against the [Banks] in [the Southern District AP]."   TA at 4725.  The Western District Bankruptcy Court issued a nearly identical order accepting jurisdiction.  TA at 407-09.

### 14.    Bankruptcy Court Opinion and Order

On March 2, 2007, the Bankruptcy Court issued an Opinion and Order granting Fleet's motion for summary judgment.  The Court found that by not objecting to the payoff amount on the Concession Loan, Adelphia "ratified" the prior payments on that Loan, as well as the transfer of the other Buffalo Sabres Loans, as they related to Fleet.  The Court held that "[b]y consenting to the pay off of Fleet, Adelphia is now barred from asserting [its fraudulent conveyance claims] as against Fleet."

The Court denied HSBC's and Key's motion for summary judgment, without prejudice to raise all state-law arguments in the Southern District AP.  The Court held that because HSBC and Key did not appear at the sale hearing, there was no "ratification" by Adelphia of the sale price of the Construction and Revolver Loans to Adelphia, as to those parties.

On March 22, 2007, the Bankruptcy Court issued an Opinion and Order correcting an error in the March 2, 2007 Opinion and Order.  On July 20, 2007, the Bankruptcy Court issued a Decision granting in part and denying in part cross-motions for reconsideration.

## DISCUSSION

### A.   Standard of Review

Under Rule 8013 of the Federal Rules of Bankruptcy Procedure, a bankruptcy court's conclusions of law are reviewed *de novo*, while factual conclusions are reviewed for clear error.  In re JLM, Inc., 210 B.R. 19, 23 (2d Cir. B.A.P. 1997).  "A finding is clearly erroneous when although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed."  Id. (quoting Anderson v. City of Bessemer, 470 U.S. 564, 573 (1985)).  Mixed questions of fact and law are subject to *de novo* review.  In re Vebeliunas, 332 F.3d 85, 90 (2d Cir. 2003).  An order of the Bankruptcy Court may be affirmed on grounds different that those found by the Bankruptcy Court.  E.g., In re Rama Group, 2002 WL 1012974 (W.D.N.Y. May 6, 2002).

B.     <u>Ratification</u>

    1.     <u>As to Fleet</u>

    As stated above, the Bankruptcy Court found that Fleet was entitled to summary judgment under a theory of "ratification."  This Court agrees.

    "Ratification is the act of knowingly giving sanction or affirmance to an act which would otherwise be unauthorized and not binding."  57 N.Y. Jur. 2d Estoppel, Ratification and Waiver § 87 (2007).  Ratification is closely related to estoppel and "implies assent, express or implied, and a change of position on the part of one who acts in reliance on such assent."  <u>Id</u>.  Ratification may be express or implied, and may result from silence or inaction.  <u>Id</u>. § 88.  Accepting the benefits of a transaction may constitute ratification, "and acquiescence may give rise to an implied ratification, as where a person's conduct subsequent to the transaction complained of supports the conclusion that he or she has accepted and adopted the transaction."  <u>Id</u>.

    The doctrine of ratification applies to transactions sought to be avoided as fraudulent transfers.  "A fraudulent transfer is not void, but voidable; thus, it can be ratified by a creditor who is then estopped from seeking its avoidance."  <u>In re Best Prods. Co.</u>, 168 B.R. 35, 57 (Bankr. S.D.N.Y. 1994), <u>appeal dismissed</u>, 177 B.R. 791 (S.D.N.Y.), <u>aff'd on other grounds</u>, 68 F.3d 26 (2d Cir. 1995); <u>see also</u> 1 G. GLENN, FRAUDULENT CONVEYANCES AND PREFERENCES, §§ 111, 113 (Rev. Ed. 1940).  "'Ratification' results when a party to a voidable contract accepts benefits flowing from the contract, or remains silent, or acquiesces in contract for any considerable length of time after he has had opportunity to annul or void the contract."  <u>Prudential Ins. Co. v.</u>

BMC Indus., Inc., 630 F. Supp. 1298, 1300 (S.D.N.Y. 1986) (action for rescission based upon fraud).  Stated another way, "[r]atification is an act by which an otherwise voidable and, as a result, invalid contract is confirmed, and thereby made valid."  Clark v. Buffalo Wire Works Co., 3 F. Supp. 2d 366, 371 (W.D.N.Y. 1998).

The Bankruptcy Court correctly found that in connection with the Bankruptcy Court's approval of the sale of NFHLP's assets, Adelphia ratified the very transactions (*i.e.*, the March 2000 sale of the Construction and Revolver Loans to Adelphia and Adelphia's payments on the Concession Loan) that Adelphia and the Committee now contend should be avoided as fraudulent transfers in the Southern District AP.  Adelphia's consent to the waiver of its lien rights in connection with the sale, and its failure to inform the Bankruptcy Court or Fleet that Adelphia might bring avoidance claims regarding the Buffalo Sabres Loans–coupled with Fleet's reliance upon Adelphia's conduct and silence--estop Adelphia and the Committee from now asserting their fraudulent transfer claims against Fleet.

Adelphia and the Committee argue that ratification does not apply because neither Adelphia nor the Committee had "full knowledge" of the March 2000 transaction at the time of the sale.   The Court finds this argument unpersuasive for two reasons.

First, the cases upon which Adelphia and the Committee rely are inapplicable because they deal with ratifications by principals of the acts of their purported agents.  Although in those circumstances, there could arguably arise some issue as to whether the principal, at the time it allegedly ratified the agent's act, had sufficient knowledge of the transaction at issue, in this case, where the ratifying party

15

(Adelphia) is the same party that entered into the transaction, there cannot be any such question; Adelphia is charged with having knowledge of its own acts.

Second, at the time of the sale hearing, Adelphia did in fact have "full knowledge" of the facts surrounding the allegedly fraudulent transfer.  At the time of the sale in April 2003, Adelphia knew that in March 2000, Sabres, Inc. paid Fleet a total of $18,583,541.96 in exchange for all of Fleet's rights, title and interest in and to the Construction and Revolver Loans.  Adelphia also knew that from 1999 to 2002, it allegedly made debt service payments to Fleet on account of the Concession Loan totaling $11.3 million.

In connection with the April 2003 sale, Adelphia waived its right to receive any portion of the purchase consideration.  Adelphia agreed to release the liens, security interests and guarantees that had been the collateral for the Construction and Revolver Loans, which Adelphia had purchased from Fleet (and the other Banks).  Adelphia gave its releases and waivers in exchange for valuable consideration, including:  (1) the release of two letters of credit totaling $27.6 million; (2) assumption of a broadcast agreement for broadcast rights to the Buffalo Sabres for five years beginning September 2002; and (3) relief from Adelphia's obligations to continue making cash advances to the team to protect the Construction Loan and Adelphia's collateral.

Also in connection with, and as part of, the sale of NFHLP's assets in April 2003, Adelphia and Fleet agreed that Fleet's Concession Loan, with a then existing balance of approximately $21.4 million, would be paid off from the proceeds of sale, in

exchange for Fleet's release of all collateral and guarantees supporting the Concession Loan.

Adelphia and the Committee argue that, in order for Adelphia to have ratified the March 2000 transaction, Adelphia had to know–in addition to all of the material facts about the transaction itself–certain additional "facts," such as that the value that Adelphia received in exchange for the Construction and Revolver Loans was supposedly less than the amount paid for the Loans; that Sabres, Inc. was allegedly insolvent or rendered insolvent by the transaction; and that John Rigas intentionally caused Sabres, Inc. to make the transfers to Fleet with the intent to hinder, delay or defraud Adelphia's creditors.  This argument is flawed, however, because it conflates two different things:  knowledge of facts regarding the March 2000 transaction–which is required, and which Adelphia did have–and knowledge that avoidance actions would be filed against the Banks–which is not required.

Adelphia and the Committee also argue that there is no evidence that Adelphia intended to ratify the March 2000 transactions.  Again, this argument is unpersuasive.

Although ratification must be done with intent–that is knowingly–such intent may be express or implied.  57 N.Y. Jur. 2d Estoppel, Ratification and Waiver §§ 87, 88.  "[A]cquiescence may give rise to an implied ratification, as where a person's conduct subsequent to the transaction complained of supports the conclusion that he or she has accepted and adapted the transaction."  Id.  Here, Adelphia acquiesced in the sale by waiving its lien rights as to the collateral purchased from Fleet three years earlier, in exchange for valuable consideration that it received.  Adelphia did so without

17

saying anything about the validity of the underlying transaction in which it had obtained its lien rights, or that such transaction was voidable as a fraudulent transfer.  Such acquiescence and silence gave rise to an implied ratification.

Adelphia and the Committee further argue that even if Adelphia ratified the March 2000 transaction, such ratification did not extend to the purchase price paid for the Construction and Revolver Loans.  In other words, they argue that although Adelphia ratified its purchase of the Loans, it did not ratify the purchase price.  The Court finds this argument unavailing.

Adelphia and the Committee do not cite, nor has the Court found, any authority for such a "partial" ratification of a single transaction, particularly where, as here, Adelphia received valuable consideration in exchange for the waiver of its lien rights, and Fleet relied to its determent on Adelphia's acts, statements and silence.

A recent Second Circuit decision holds that the proper remedy in a fraudulent transfer action is rescission of the underlying transaction, not just a piece of it, such as the purchase price.  In <u>Grace v. Bank Leumi Trust Co.</u>, 443 F.3d 180, 189 (2d Cir. 2006), <u>cert. denied</u>, 549 U.S. 1114 (2007), the Second Circuit held that "[t]he proper remedy in a fraudulent conveyance claim is to rescind, or set aside, the allegedly fraudulent transfer, and cause the transferee to return the transferred property to the transferor."  Accordingly, there is no basis for Adelphia's and the Committee's attempts to apply ratification to only the sale of the loans, while preserving a fraudulent transfer claim as to the purchase price.

In support of their argument that Adelphia ratified only its ownership rights in the Loans and not the purchase price, Adelphia and the Committee rely primarily on

18

the Second Circuit's decision in <u>FCC v. NextWave Personal Communications, Inc.</u>, 200
F.3d 43 (2d Cir. 2000), <u>cert. denied</u>, 531 U.S. 924 (2000).  However, that case is
inapposite.

In <u>NextWave</u>, a Chapter 11 debtor, in its capacity as high bidder at
government auction of C-Block radio spectrum licenses for personal communication
services, brought an adversary proceeding seeking to set aside its resulting obligation
to the Federal Communications Commission ("FCC") as a constructively fraudulent
transfer under state law. In finding for the debtor, the Bankruptcy Court held that the
sale of the licenses constituted fraudulent transfers and as a result, the debtors could
avoid making further payments to the FCC.  The district court affirmed, and FCC
appealed.  The Second Circuit held that: (1) the courts below exceeded their jurisdiction
by in effect intervening in the allocation of radio spectrum licenses, which was within
FCC's exclusive regulatory jurisdiction; and (2) the transaction in which licenses were
issued was not constructively fraudulent in any event.

It is in this factual context that the Second Circuit stated that a fraudulent
conveyance "can be avoided."  <u>Id</u>. at 49.  Then in a footnote, the court stated:
"Avoidance differs considerably from rescission.  Rescission unwinds the transaction
and restores the status quo ante, whereas avoidance allows the debtor to retain the
benefit of its bargain while rewriting the debtor's obligations under that same bargain."
<u>Id</u>. at 49 n.6.  Adelphia and the Committee rely on this language to support their
argument that Adelphia can retain the benefit of its bargain while at the same time
challenging the purchase price it paid.  Their reliance is misplaced.  First, the language
they rely on is *dicta*.  The Second Circuit determined that there was no fraudulent

19

transfer, so it did not reach the issue of remedy.  Second, <u>NextWave</u> involved the issue of whether an obligation to pay more money could be avoided; not whether monies already paid could be recouped, which is the issue here.  Finally, Adelphia's and the Committee's interpretation of <u>NextWave</u> would make that case inconsistent with the Second Circuit's more recent decision in <u>Grace</u>, stating that the remedy for a fraudulent transfer is "limited" to rescission.  <u>Grace</u>, 443 F.3d at 189.

In sum, the Court finds that the Bankruptcy Court correctly held that by remaining silent at the April 2003 sale hearing, Adelphia ratified the 2000 purchase of the Construction and Revolver Loans from Fleet, as well as the payments that it made to Fleet on the Concession Loan.  Thus, Fleet is entitled to judgment as a matter of law.

### 2.    **As to HSBC and Key**

The Bankruptcy Court found that unlike Fleet, HSBC and Key were not entitled to summary judgment on the grounds of ratification because they did not appear at the sale hearing.  The Court finds that this was incorrect and that HSBC and Key, like Fleet, are entitled to summary judgment based on Adelphia's ratification of the 2000 transactions.

With regard to the Construction and Revolver Loans, there was no reason for HSBC and Key to be present at the sale hearing.  The uncontested evidence is that the Junior Participation Agreement governing the sale of those Loans ripened into 100% ownership by Sabres, Inc.  The Committee's counsel has admitted as much during the course of proceedings in this case. <u>See</u> HSBC Record on Appeal, Vol. 10,

Doc. 63, p.95.  Thus, as far as HSBC and Key were aware, at the time of the sale hearing, they had no ownership interests whatsoever in the Loans and had no reason to appear.

For the same reasons cited above with respect to Fleet, the Court finds that by remaining silent at the April 2003 sale hearing, Adelphia ratified the 2000 purchase of the Construction and Revolver Loans from HSBC and Key.  Thus, like Fleet, HSBC and Key are entitled to judgment as a matter of law.


**C.    _Res Judicata_ or Claim Preclusion**

The doctrine of _res judicata_, or claim preclusion, holds that following entry of a valid final judgment, "the parties to the suit and their privies are thereafter bound not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose."  C.I.R. v. Sunnen, 333 U.S. 591, 597 (1948) (internal quotations and citation omitted); In re Teltronics Servs., 762 F.2d 185, 190 (2d Cir. 1985).  The doctrine of _res judicata_ bears on "the effect of a judgment in foreclosing litigation of a matter that never has been litigated, because of a determination that it should have been advanced in an earlier suit."  Migra v. Warren City School Dist. Bd. of Educ., 465 U.S. 75, 77 n.1 (1984).

_Res judicata_ "is a rule of fundamental repose important for both the litigants and for society."  In re Teltronics Servs., 762 F.2d at 190.  It "relieve[s] parties of the cost and vexation of multiple lawsuits, conserve[s] judicial resources, and, by

preventing inconsistent decisions, encourage[s] reliance on adjudication."  Allen v. McCurry, 449 U.S. 90, 94 (1980).  "Public policy supports *res judicata* generally, but in the bankruptcy context in particular."  Crop-Maker Soil Servs. v. Fairmount State Bank, 881 F.2d 436, 440 (7th Cir. 1989); see also In re Lawrence, 293 F.3d 615, 621 (2d Cir. 2002) (emphasizing role of *res judicata* in preventing the opening of "floodgates to future litigation attacking the final orders of sale in [a] bankruptcy court proceeding, a forum where finality of court orders is particularly important."); Hendrick v. H.E. Avent, 891 F.2d 583, 587 n.9 (5th Cir.) ("This Court has previously recognized the important interest in the finality of judgments in a bankruptcy case.") (citations omitted), cert. denied, 498 U.S. 819 (1990).

Res judicata applies to preclude later litigation if the earlier decision was (1) a final judgment on the merits, (2) by a court of competent jurisdiction, (3) in a case involving the same parties or their privies, and (4) involving the same cause of action. In re Teltronics Servs., 762 F.2d at 190 (citations omitted).

Applying the principles of *res judicata* to the instant case, the Court finds that the orders issued by the Western District Bankruptcy Court relating to the sale of NFHLP's assets to Hockey Western preclude Adelphia and the Committee from pursuing their claims of fraudulent conveyance in the Southern District AP. Accordingly, the Banks are entitled to judgment as a matter of law.

**1.      Bankruptcy Court's Orders Constituted a Final Judgment on the Merits by a Court of Competent Jurisdiction**

Both the Sale Approval Order and the Adelphia Stipulation and Order

constituted a final judgment on the merits by a court of competent jurisdiction. <u>E.g.</u>, <u>In re Met-L-Wood Corp.</u>, 861 F.2d 1012, 1018 (7th Cir. 1988) (affirming dismissal of fraud suit as impermissible collateral attack on bankruptcy court order and "hold[ing] that confirmed sales–which are final judicial orders–can be set aside only under [R]ule 60(b)[of the Federal Rules of Civil Procedure]"), <u>cert. denied</u>, 490 U.S. 1006 (1989); <u>Hendrick</u>, 891 F.2d at 586 ("[a]n order issued by the bankruptcy court authorizing the sale of part of the bankrupt estate is a final judgment even though the order neither closes the bankruptcy case nor disposes of any claim."). Thus, the first and second elements of *res judicata* are satisfied.

### 2. The Same Parties are Involved in Both Actions

Adelphia and the Banks were all creditors in the NFHLP bankruptcy proceedings: Adelphia, as NFHLP's single largest secured and non-secured creditor, Fleet as primary lender on the Concession Loan, Key as co-lender on the Concession Loan, and HSBC by virtue of a naming rights agreement to the HSBC Arena. As creditors of NFHLP, they were all parties to the NFHLP bankruptcy. <u>See</u> <u>In re Justice Oaks II, Ltd.</u>, 898 F.2d 1544, 1550-51 (11th Cir. 1990) (in the bankruptcy context, all creditors of a debtor are parties in interest for *res judicata* purposes with respect to orders issued in the administration of a bankruptcy proceeding). All these parties are also parties to the Southern District AP. Thus, the third element of *res judicata* is satisfied.

Adelphia and the Committee argue that *res judicata* does not apply with regard to HSBC and Key because they did not participate in the sale hearing.  The Court finds this argument unpersuasive for two reasons.

First, neither Adelphia nor the Committee has cited, nor has the Court found, any authority for the proposition that a party must be present at a court proceeding in order to be eligible for protection under the doctrine of *res judicata*.

Second, as stated above, with regard to the Construction and Revolver Loans, there was no reason for HSBC and Key to be present at the sale hearing, because it is undisputed that the Junior Participation Agreement governing the sale of those Loans ripened into 100% ownership by Sabres, Inc.

### 3.    <u>Same Cause of Action</u>

To determine whether the causes of action are the same, the Court must examine whether the same transaction, evidence, and factual issues are involved in both cases.  <u>Corbett v. MacDonald Moving Services, Inc.</u>,124 F.3d 82, 89 (2d Cir. 1997) (citing <u>Sure-Snap Corp. v. State Street Bank and Trust Co.</u>, 948 F.2d 869, 874 (2d Cir.1991); <u>NLRB v. United Technologies Corp.</u>, 706 F.2d 1254, 1260 (2d Cir. 1983)).  In the bankruptcy context, the Court must also determine "whether an independent judgment in a separate proceeding would impair or destroy rights or interests established by the judgment entered in the first action."  <u>Id</u>. (internal quotations and citation omitted).

Because a bankruptcy case is fundamentally different from the typical civil action, comparison of a bankruptcy proceeding with another proceeding is not

susceptible to the standard *res judicata* analysis. Rather, the Court must scrutinize the totality of the circumstances in each action and then determine whether there is identity of causes of action.  See Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414, 419 n.5 (3d Cir. 1988).

Scrutinizing the totality of the circumstances in the instant case, the Court finds that there is sufficient identity between the claims raised in the NFHLP Bankruptcy and the Southern District AP to warrant the application of the doctrine of *res judicata*. The same transaction, evidence, and factual issues are involved in both cases.  In addition, a judgment in favor of Adelphia and the Committee in the Southern District AP would impair or destroy the rights and interests of the Banks established by the judgment entered in the NFHLP Bankruptcy.

One of the central claims or issues in the NFHLP Bankruptcy was the identification of any and all parties having ownership or lien interests in NFHLP's assets.  The Western District Bankruptcy Court, the Southern District's Adelphia Approval Order, and the purchaser, Hockey Western, required that the sale or transfer of any of Adelphia's interests in NFHLP's assets be free and clear of any liens.

With regard to the Construction and Revolver Loans, Adelphia, by the Adelphia Stipulation and Order, represented to the Bankruptcy Court, the parties to the NFHLP Bankruptcy, including the Banks, and Hockey Western that it was the sole owner of those Loans and their accompanying liens.  Adelphia agreed to release its rights and liens under those Loans in exchange for certain consideration.  Adelphia never asserted or even mentioned any possible avoidance claims against the Banks, although it could have.  Essential to the Bankruptcy Court's Sale Approval Order as it

25

related to the Construction and Revolver Loans was that Adelphia was the sole owner of those Loans.  Otherwise, the NFHLP assets acting as collateral for those Loans could not have been transferred to Hockey Western free and clear of any liens, at least without further litigation.

Had Adelphia raised the possibility of avoidance claims before the sale was approved, it unquestionably would have changed the outcome of the litigation. The remedy in an avoidance action is rescission of the fraudulent transfer.  See Grace, 443 F.3d at 189; Hassett v. Goetzmann, 10 F. Supp. 2d 181, 192 (N.D.N.Y. 1998).  In other words, when a fraudulent transfer is avoided, the parties are restored to their previous positions.  In this instance, it would have meant that the sale of the Construction and Revolver Loans by the Banks to Sabres, Inc. would have been voided and the Banks would still have owned the Loans and accompanying liens on NFHLP's assets (which included the HSBC Arena).  These same NFHLP assets, however, were about to be sold to Hockey Western free and clear.  The Banks obviously would have come forward to stop the sale, or at least modify its terms, in order to protect their interests in either the NFHLP assets or the proceeds of the sale.  The Bankruptcy Court then would have had to either stop the sale or somehow resolve the avoidance claims before the assets could be sold free and clear to Hockey Western.  Because Adelphia never raised the possibility of avoidance claims against the Banks, the Banks never came forward, and the NFHLP assets were sold to Hockey Western free and clear.

A judgment now in favor of Adelphia on their avoidance claims in the Southern District AP would impair or destroy the rights and interests of the Banks established by the judgment entered in the NFHLP Bankruptcy case.  By necessary

26

implication, the Bankruptcy Court's Sale Approval Order found that the Banks had no

lien interests in the NFHLP assets and allowed the collateral supporting those liens to

be sold free and clear.  If the original transfer of the Construction and Revolver Loans

were now to be voided as a result of a judgment in the Southern District AP, the Banks

would once again become the owners of the Loans, but would have no collateral

against which to place liens.  The Banks would be hung out to dry.

      With regard to the Concession Loan, Adelphia agreed that the proceeds

of the sale could be used to pay off that Loan.  In calculating the amount due on the

Concession Loan, full credit was given to the $11.3 million in principal and interest

payments Adelphia had already paid on the loan.  Adelphia consented to the "cash out"

amount of $21.4 million.  Adelphia never raised the possibility of any fraudulent

conveyance claim against Fleet with regard to the $11.3 million already paid on the

Loan, although it could have.  Instead, it allowed the sale to go forward, and the

collateral for the Loan was sold to Hockey Western.

      In sum, the claims in the Southern District AP arise from the same

transaction, evidence, and facts involved in the proceedings culminating in the Sale

Approval Order in the NFHLP Bankruptcy.  An independent judgment in the Southern

District AP would impair or destroy the judgment in the NFHLP Bankruptcy case.  Thus,

the fourth element of *res judicata* has been satisfied.

      Adelphia had the opportunity during the NFHLP Bankruptcy proceedings

to raise the possibility of avoidance claims against the Banks, but failed to do so.

Instead, Adelphia appears to have made a tactical decision or choice to keep silent

about such claims so that the sale would go forward.  In exchange for its silence,

27

Adelphia received valuable consideration and perhaps most importantly, was relieved

from having to pump any further cash into the floundering Buffalo Sabres franchise in

order to protect its own interest in the Construction Loan and the collateral for the Loan

(*i.e.*, the HSBC Arena).  Adelphia now wants a second bite at the apple.  This situation

exemplifies why the doctrine of *res judicata* is so important in bankruptcy cases.  Such

cases are often complex and involve numerous parties and claims.  Thus, it is essential

that any party having a claim "put its cards on the table" so that such claim can be

addressed in the first instance and the rights and interests of all the parties to the

bankruptcy can be determined at one time in one final judgment.


####     4.    Adelphia's and the Committee's Arguments against the Application of *Res Judicata*

#####         a.    Lack of Knowledge

Adelphia and the Committee argue that the doctrine of *res judicata* cannot

be applied here because in April 2003, they did not have yet have "full knowledge" of

the facts supporting avoidance claims against the Banks and therefore could not have

been expected to raise such claims prior to the entry of the Sale Approval Order in the

NFHLP Bankruptcy.  This argument is unpersuasive.

Even if Adelphia did not have "full knowledge" in April 2003, of all facts

necessary to support avoidance claims against the Banks, it certainly knew of facts

showing at least the possibility of such claims.  Adelphia obviously knew that it had

purchased the Construction and Revolver Loans from the Banks; in fact, Adelphia itself

disclosed those purchases in its Form 8-K filing with the Securities and Exchange

Commission on May 24, 2002, nearly a year before the sale of NFHLP's assets. Adelphia also had in its own books and records the wire transfer documents evidencing the payments from Adelphia to the Banks for the Construction and Revolver Loans. The Committee's accountants, moreover, received copies of those documents in February 2003.

Likewise, Adelphia knew that its funds were purportedly being used to pay principal and interest on the Construction Loan and the Concession Loan, and that NFHLP was being used as a conduit for those payments to the Banks.  Adelphia's wire transfer documents for those payments each identify NFHLP (or, in some instances, CALLC) as the company making the payments, although the funds were allegedly coming from Adelphia.  In addition, Adelphia was aware that its funds were purportedly being used to finance the operations of NFHLP, as shown by Adelphia's own disclosure of that fact in the May 24, 2002 8-K.  Further, Adelphia's CEO at the time of the bankruptcy filing, Erland Kailbourne, testified that he was aware as early as April 2002 that NFHLP's funds were being co-mingled with Adelphia's through Adelphia's Cash Management System ("CMS").

Perhaps the most telling evidence of Adelphia's pre-April 2003 knowledge comes from its own adversary proceeding complaint against NFHLP and others, which it filed on or about July 24, 2002 (the "Rigas AP").  In that proceeding, Adelphia alleged that NFHLP was part of a conspiracy to defraud Adelphia through the use of the CMS for purposes unrelated to Adelphia.  The Rigas AP alleged that all of NFHLP's receivables were deposited into the CMS, and all of its payables were paid out of the CMS.  It further alleged that Adelphia bought the Construction and Revolver Loans from

the Banks and financed NFHLP's operations through withdrawals of cash from the

CMS.  Adelphia alleged that these actions constituted a "concerted course of conduct

with the purpose and effect of defrauding" Adelphia.  Accordingly, as early as July

2002, Adelphia was purporting to be aware that its payments on behalf of NFHLP to the

Banks were potentially the subject of fraud claims as against NFHLP.  It follows that, at

the same time, Adelphia had constructive knowledge that it possessed possible

fraudulent transfer claims against the Banks, as the ultimate recipients of the funds of

which NFHLP allegedly defrauded Adelphia.

Based on this evidence, there is no question that Adelphia had knowledge

of facts supporting at least the possibility of avoidance claims against the Banks prior to

April 2003.  Adelphia was therefore required to raise such a claim in the NFHLP

Bankruptcy proceeding or be barred from doing so later under the doctrine of *res

judicata*.  In fact, the Adelphia Approval Order required that when consenting to the sale

or transfer of any of Adelphia's interests in NFHLP free and clear of any liens, Adelphia

was to do so "subject to the rights and defenses" of Adelphia.  Thus, the Adelphia

Approval Order placed the burden on Adelphia to raise all possible rights and defenses

when appearing in the NFHLP Bankruptcy.

Even if it assumed that in April 2003, Adelphia had no knowledge

whatsoever of facts supporting possible avoidance claims against the Banks and only

discovered such facts at a later date, the avoidance claims in the Southern District AP

are still barred by the doctrine of *res judicata*.  For the reasons stated above, the Sale

Approval Order in the NFHLP Bankruptcy is a final judgment entitled to *res judicata*

effect.  In essence, what Adelphia and the Committee are attempting to do in the

Southern District AP is to collaterally attack the Sale Approval Order based on supposedly newly discovered evidence.  This is not permitted.  Bankruptcy court orders approving sales of property are final judgments, which, if not timely appealed or timely challenged under Rule 60(b) are entitled to *res judicata* effect.  See In re American Preferred Prescription, Inc., 255 F.3d 87, 92 (2d Cir. 2001); Gekas v. Pipin (In re Met-L-Wood Corp.), 861 F.2d 1012, 1018 (7th Cir. 1988), cert. denied, 490 U.S. 1006 (1989) (affirming dismissal of fraud suit as impermissible collateral attack on bankruptcy court's order and "hold[ing] that confirmed sales-which are final judicial orders-can be set aside only under rule 60(b)").  "*Res judicata* applies even where new claims are based on newly discovered evidence, unless the evidence was either fraudulently concealed or it could not have been discovered with due diligence."  L-TEC Elecs. Corp. v. Cougar Elec. Org., Inc., 198 F.3d 85, 88 (2d Cir.1999) (internal quotation marks omitted).

        Adelphia and the Committee never appealed the Sale Approval Order and never sought relief from judgment under Rule 60(b).  Nor have they alleged that their newly discovered evidence was fraudulently concealed or could not have been discovered with due diligence.  Thus, whatever the merits of their claims in the Southern District AP, Adelphia and the Committee are barred under the doctrine of *res judicata* from pursuing them.  See Federated Dep't Stores, Inc. v. Moitie, 452 U.S. 394, 398 (1981) ("Nor are the *res judicata* consequences of a final . . . judgment on the merits altered by the fact that the judgment may have been wrong.").

31

### b.    Lack of Jurisdiction

Adelphia and the Committee next argue that the doctrine of *res judicata* does not apply because the Western District Bankruptcy Court, as a matter of law, could not have entertained an adversary proceeding involving the Adelphia estates when the Adelphia Bankruptcy was being overseen by the Southern District Bankruptcy Court.  Again, the Court finds this argument unpersuasive.

Assuming that Adelphia and the Committee are correct regarding the Western District's lack of jurisdiction to entertain such an adversary proceeding[2], such fact still would not have relieved Adelphia from its obligation to raise the potential avoidance claims against the Banks in the NFHLP Bankruptcy.  In fact, as stated above, the Adelphia Approval Order placed the burden on Adelphia to raise all possible rights and defenses when appearing in the NFHLP Bankruptcy.  The identity of the particular court in which such rights and defenses would ultimately be adjudicated was immaterial.

### c.    § 546(a)(1) Statute of Limitations

Adelphia and the Committee further argue that they were not required to raise their avoidance claims in the NFHLP Bankruptcy because their time to bring such claims had not yet run under 11 U.S.C. § 546(a)(1), a statute of limitations provision

---

[2]    The Court notes that the Adelphia Approval Order may have arguably granted such jurisdiction. Or, the respective bankruptcy courts and the parties might have reached some sort of agreement over jurisdiction, as was done here.

applicable to fraudulent transfer claims by a debtor.  The Court finds this argument without merit.

Even if it is assumed that at the time of the sale hearing Adelphia did not know for certain that it had a factual basis for bringing avoidance actions against the Banks, as stated above, the evidence shows that it was investigating the possibility of such claims.  The Adelphia Approval Order required Adelphia to preserve all its rights and defenses when releasing its liens.  Thus, at a minimum, Adelphia should have stated at the sale hearing that the waiver of its lien rights was subject to all its rights and defenses, that it was still investigating possible avoidance claims, and that the time to assert such claims had not yet run under § 546(a)(1).  Had Adelphia done that, it would have been free to continue its investigation and assert its avoidance claims in the Souther District AP within the limitations period in § 546(a)(1).  Instead, Adelphia chose to remain silent and as a result, is now barred by *res judicata* from bringing such claims.

### d.    No Evidence of Credit on Concession Loan

Finally, with regard to the Concession Loan, Adelphia and the Committee argue that there is no evidence that Adelphia obtained "credit" in the NFHLP asset sale for the $11.3 million it previously paid to Fleet as installment payments on the Concession Loan, and therefore they should not be precluded from seeking a return of those payments.  The Court finds that this argument is belied by the record and common sense.

In exchange for its consent to surrender its security interests on the Concession Loan, Fleet demanded that it be "paid in full" on the Concession Loan from

the proceeds of the sale, and all parties, including Adelphia, consented.  The amount due–$21.4 million–was calculated giving full credit for prior payments of $11.3 million to Fleet on that Loan.  The Committee concedes that Adelphia consented to the "cash out" amount, but maintains that there is no evidence that it took into account or gave itself a credit for the $11.3 million.  However, the issue is not whether Adelphia subjectively credited itself the $11.3 million.  The fact remains that the Bankruptcy Court, the purchaser and Fleet all credited that amount to the benefit of Adelphia.


**D.** **Judicial Estoppel**

Adelphia's and the Committee's avoidance claims in the Southern District AP are also barred by the doctrine of judicial estoppel.

Judicial estoppel "prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase."  New Hampshire v. Maine, 532 U.S. 742, 749 (2001) (internal quotation marks omitted).  The doctrine of judicial estoppel provides that, "[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him."  Id. (internal quotations and citation omitted).  Judicial estoppel ensures, *inter alia*, that "abandonment of a claim to obtain a litigation advantage precludes the later reassertion of that claim."  Peralta v. Vasquez, 467 F.3d 98, 105 (2d Cir. 2006).

The Supreme Court, exercising its original jurisdiction over a boundary dispute between New Hampshire and Maine, identified "several factors" that "typically inform the decision whether to apply the doctrine in a particular case":

> First, a party's later position must be clearly inconsistent with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled . . . .  A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

New Hampshire, 532 U.S. at 750-51 (internal quotation marks and citations omitted). In "enumerating these factors," the Court cautioned that it was not establishing "inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel." Id.  The Court concluded that judicial estoppel applied to prevent New Hampshire from re-litigating its eastern boundary with Maine, where New Hampshire would be taking a position inconsistent with a consent decree it entered into in 1977. Id. at 756.

Applying these principles to the instant case, the Court finds that judicial estoppel bars Adelphia's and the Committee's avoidance claims in the Southern District AP.

First, the position that Adelphia and the Committee are taking in the Southern AP action is clearly inconsistent with the position that they took in the NFHLP Bankruptcy.  In the NFHLP Bankruptcy, Adelphia consistently represented to the Bankruptcy Court that it was the sole owner of the Construction and Revolver Loans and therefore was the only party whose consent was necessary for the sale of

35

NFHLP's assets free and clear of all liens, claims and encumbrances.  In contrast, in the Southern District AP, Adelphia and the Committee are claiming that the purchases of the Construction and Revolver Loans were fraudulent conveyances and therefore subject to rescission, which would mean that the Banks would be the owners of the Loans, contrary to what Adelphia and the Committee represented in the NFHLP Bankruptcy.

Second, the Court in the NFHLP Bankruptcy unquestionably relied upon the Adelphia's representation that it was the sole owner of the Loans.  As stated above, had the NFHLP Court been aware of potential avoidance claims against the Banks, the Bankruptcy Court would either have not issued the Sale Approval Order or would have modified it to account for the Banks' possible interests in the NFHLP assets.  If the Bankruptcy Court in the Southern District AP were now to find that the purchases of the Loans were fraudulent conveyances, it would create the perception that the NFHLP Bankruptcy Court was misled.

Third, a finding in the Southern District AP that the purchases of the Loans were fraudulent conveyances and therefore subject to rescission would impose an unfair detriment on the Banks. As stated above, the Banks would once again become the owners of the Loans, but would have no collateral against which to place liens.

Courts have consistently applied the doctrine of judicial estoppel, under circumstances similar to those here, to bar a party's claims or objections that are inconsistent with its prior legal position.  See, e.g., Breeden v. Kirkpatrick & Lockhart, LLP, 268 B.R. 704, 711 n.5 (S.D.N.Y. 2001) (doctrine of judicial estoppel barred

trustee from disputing a key factual contention on summary judgment motion because trustee had agreed with that contention in a prior motion to consolidate the debtors' estates), aff'd, 336 F.3d 94 (2d Cir. 2003).

In In re Galerie des Monnaies of Geneva, Ltd., 55 B.R. 253, 259 (Bankr. S.D.N.Y. 1985), aff'd, 62 B.R. 224 (S.D.N.Y. 1986), the bankruptcy court granted a defendant bank's motion to dismiss on judicial estoppel grounds a debtor's preference claims.  Those claims, the court held, were barred because they were premised on a legal position that was inconsistent with the debtor's prior representations in its amended disclosure statement, in which the debtor had stated that management did not believe any preferences or fraudulent conveyances had occurred.  The debtor actually knew within two months after its disclosure statement of at least some of the allegedly fraudulent transfers, yet never amended its statement or brought an adversary proceeding before its plan of reorganization was confirmed.  Thus, the court concluded, the debtor could not reverse itself and bring a preference claim for its own benefit.  Id. at 260.

In sum, Adelphia's position in the Southern District AP is clearly inconsistent with the position it took in the NFHLP Bankruptcy.  The Bankruptcy Court in the NFHLP Bankruptcy relied on Adelphia's prior position in rendering its Sale Approval Order and allowing the sale of NFHLP's assets free and clear of any liens. The Banks would be unfairly prejudiced if the Southern District AP were not estopped. Thus, the Banks are entitled to judgment as a matter of law on their claim of judicial estoppel.

**E.**     **Quasi Estoppel**

In addition to ratification, *res judicata* and judicial estoppel, Adelphia's
and the Committee's avoidance claims in the Southern District AP are also barred by
the doctrine of quasi-estoppel.  Quasi estoppel operates to bar a party from asserting,
to another's disadvantage, a right inconsistent with a position previously taken by that
party.  Erie Telecomms., Inc. v. City of Erie, 659 F.Supp. 580, 585 (W.D. Pa. 1987);
Chautauqua County Fed'n of Sportsmens Club, Inc. v. Caflisch, 15 A.D.2d 260, 264
(4th Dep't 1962). The doctrine, which is based on fundamental principles of equity,
"applies where it would be unconscionable to allow a person to maintain a position
inconsistent with one in which he acquiesced, or of which he accepted a benefit." Erie
Telecomms, 659 F.Supp. at 585 (internal quotations and citations omitted).

The seminal case on quasi estoppel is Simmons v. Burlington, C.R. &
N.R. Co., 159 U.S. 278 (1895).  In Simmons, a debtor railroad's lines, income and
equipment were encumbered by senior and junior mortgage holders.  The debtor was
in default, and the court ordered the foreclosure and sale of the lines and franchises
and appurtenant property with the proceeds payable to those who assented to the
sale.  Seven years after the sale, a junior-secured equipment creditor petitioned the
court to redeem its collateral from the purchaser.  The Supreme Court held that where
a junior mortgagee is a party-defendant to a foreclosure bill and such junior mortgagee
chooses not to assert its rights (notwithstanding the fact that the terms of the order
may not have expressly foreclosed the junior mortgagee's rights) and stands by while a
sale is made and confirmed free and clear of all liens, the junior mortgagee is
estopped from later asserting its rights, because

38

[e]ven when it does not work a true estoppel upon rights of property or of contract, it may operate in analogy to estoppel - may produce a *quasi estoppel* upon the rights of remedy.' And in section 965: *'When a party*, with full knowledge, or at least *with sufficient notice or means of knowledge, of his rights, and of all the material facts, freely* does what amounts to a recognition of the transaction as existing, or *acts in a manner inconsistent with its repudiation*, or lies by for a considerable time, and knowingly permits the other party to deal with the subject-matter under the belief that the transaction has been recognized, or freely abstains for a considerable length of time from impeaching it, so that the other party is thereby reasonably induced to suppose that it is recognized, *there is acquiescence; and the transaction, although originally impeachable, becomes unimpeachable in equity.* Even where there has been no act nor language properly amounting to an acquiescence, a mere delay, a suffering time to elapse unreasonably, may of itself be a reason why courts of equity refuse to exercise their jurisdiction in cases of actual and constructive fraud, as well as in other instances. It has always been a principle of equity to discourage stale demands. Laches are often a defense wholly independent of the statute of limitations.

Simmons, 159 U.S. at 291-92 (emphasis added) (quoting, 2 Pom. Eq. Jur. § 816).

Simmons is on point with this case. As stated above, at the time of the sale hearing in the NFHLP Bankruptcy, Adelphia had knowledge of facts putting it on notice of the possibility of avoidance claims against the Banks. However, instead of trying to repudiate the allegedly fraudulent conveyances, it chose to remain silent. Thus, Adelphia acquiesced, and the conveyances, although perhaps "originally impeachable, became unimpeachable in equity."[3]

---

[3] In light of its rulings with regard to ratification, *res judicata*, judicial estoppel and quasi estoppel, the Court finds it unnecessary to determine whether Adelphia's and the Committee's avoidance claims are also barred under the doctrines of equitable estoppel, collateral estoppel, accord and satisfaction, and the "single satisfaction" rule.

## CONCLUSION

For the reasons stated, the Court: (1) affirms the Bankruptcy Court as to Fleet; finding that Fleet is entitled to judgment as a matter of law; and (2) reverses the Bankruptcy Court as to HSBC and Key, finding that they are also entitled to judgment as a matter of law.  The Clerk of Court shall take all steps necessary to close the case.


SO ORDERED.

s/ *Richard J. Arcar*a
HONORABLE RICHARD J. ARCARA
CHIEF JUDGE
UNITED STATES DISTRICT COURT

DATED:  February 12, 2009